```
 1               IN THE UNITED STATES DISTRICT COURT

 2                      DISTRICT OF WYOMING

 3    -----------------------------------------------------------

 4    SUSAN E. CHRISTENSEN,          )
                                     )
 5               Plaintiff,          )
                                     )
 6               vs.                 )    Docket No. 24-CV-00077
                                     )
 7    NATRONA COUNTY SCHOOL          )
      DISTRICT NO. 1,                )
 8                                   )
                 Defendant.          )
 9    -----------------------------------------------------------

10

11               DEPOSITION OF SUSAN CHRISTENSEN
                    Taken in behalf of Defendant

12
                      9:09 a.m., Tuesday
13                    March 11, 2025

14

15          PURSUANT TO NOTICE, the deposition of

16    SUSAN CHRISTENSEN was taken in accordance with the

17    applicable Wyoming Rules of Civil Procedure at the

18    offices of Williams, Porter, Day, and Neville, 159 North

19    Wolcott, Suite 400, Casper, Wyoming, before Alexis

20    Taylor, Registered Professional Reporter and Notary

21    Public of the State of Wyoming.

22

23

24

25
```

ALEXIS TAYLOR, RPR
(307)262-3334

EXHIBIT
1

2

1                    A P P E A R A N C E S

2   For the Plaintiff:      CASANDRA A. CRAVEN
                            Longhorn Law
3                           109 East 17th Street, Suite 11
                            Cheyenne, Wyoming 82001
4                           ccraven.law@gmail.com

5   For the Defendant:      SEAN W. SCOGGIN
                            CARL A. EDELMAN
6                           ZARA MASON
                            Williams, Porter, Day & Neville
7                           702 Randall Avenue
                            P.O. Box 748
8                           Cheyenne, Wyoming 82001
                            sscoggin@wpdn.net
9                           cedelman@wpdn.net
                            zmason@wpdn.net
10
    Also Present:           Angela Hensley
11

12                          **INDEX**
                                                      **PAGE**
13  **DEPOSITION OF SUSAN CHRISTENSEN:**

14  Examination by Mr. Scoggin                          3

15                    **INDEX TO EXHIBITS**

16  **EXHIBIT**                              **IDENTIFIED**

17  1    Ms. Christensen's timeline                     32

18

19

20

21

22

23

24

25

                    ALEXIS TAYLOR, RPR
                      (307)262-3334

1                    P R O C E E D I N G S

2                    (Deposition proceedings commenced

3                    9:09 a.m., March 11, 2025.)

4                    SUSAN CHRISTENSEN,

5    called for examination by the Defendant, being first duly

6    sworn, on her oath testified as follows:

7                              EXAMINATION

8    BY MR. SCOGGIN:

9        Q.    Will you please state your full name for the

10   record.

11       A.    Susan Elizabeth Christensen.

12       Q.    I just introduced myself off the record, but my

13   name is Sean Scoggin.  I'm one of the attorneys

14   representing Natrona County School District in this

15   lawsuit.

16             Ma'am, have you ever had your deposition taken

17   before?

18       A.    I was -- I remembered on the way here I was in

19   a car accident here that I had to go to a deposition, and

20   it got thrown out, because the man who hit me was clearly

21   in the wrong.  So that's the only time I've been deposed.

22       Q.    So you did go through at least the process at

23   that time and had your deposition taken?

24       A.    I believe so.  We were in a courtroom so I

25   don't remember the details.  It was, like, 2006.

1    Q.    How long then did you teach second grade at

2    Sagewood Elementary?

3    A.    21, 22 years, somewhere in there.

4    Q.    When you made the move to teaching second

5    grade, would that have been approximately 2001?

6    A.    Yes.

7    Q.    Who was the principal when you made that move

8    at Sagewood?

9    A.    That was still Gary Bieber, I believe.

10    Q.    Were there other principals that you worked for

11    during your time at Sagewood?

12    A.    Yes, Mike Bond, Tyler Hartl.

13    Q.    Can you spell Tyler's last name.

14    A.    H-A-R-T-L.  And Anna Lavin.

15            COURT REPORTER:  I'm sorry, say that

16    again.

17            THE DEPONENT:  Anna Lavin.

18    Q.    (By Mr. Scoggin)  Do you remember approximately

19    what period of time that Mike Bond was the principal?

20    A.    He was only there one year.

21    Q.    And do you remember the time period that Tyler

22    Hartl was the principal?

23    A.    Four years, sorry.

24    Q.    And what period of time did you work at

25    Sagewood where Anna Lavin was the principal?

1      A.     I believe four years.

2      Q.     Do you remember what calendar years or school

3   years those were?

4      A.     I believe she started in 2018, and I left three

5   years ago so it would have been '22.

6      Q.     In the 21 to 22-year period that you taught

7   second grade at Sagewood, did you have your own

8   classroom?

9      A.     Yes.

10      Q.     And during that period of time, because I've

11   seen it done different ways, would you teach the full

12   spectrum of classes or did you have certain areas that

13   you taught second graders?

14      A.     I taught all subjects.

15      Q.     And was that consistent throughout the entire

16   time that you taught second?

17      A.     Yes, sir.

18      Q.     What was your last school year teaching at

19   Sagewood Elementary?

20      A.     '21-'22.  I've been gone three years so 2021.

21      Q.     It would have been the spring of --

22      A.     Fall.  It would be fall '22-'23 because I

23   started at Cottonwood in 20 -- sorry, you're asking me to

24   do math, it's not my forte.

25      Q.     It's okay.  There's a reason I'm an attorney as

1    well; I'm not good at math.

2            I just want to get an idea.  Let me ask you

3    this way and then maybe I'll back up:  Are you currently

4    employed?

5        A.    Yes, sir.

6        Q.    Where are you currently employed?

7        A.    Paradise Valley Elementary.

8        Q.    How long have you been at Paradise Valley

9    Elementary --

10       A.    One year.  This is my first year.

11       Q.    What is your current position at Paradise

12   Valley?

13       A.    I'm a tutor.

14       Q.    And then are you under a contract as a tutor

15   for the 2024-2025 school year?

16       A.    Yes, sir.

17       Q.    With the position or the contract as being a

18   tutor, can you give me an idea this year as to what are

19   your job duties?  What are you doing at Paradise Valley?

20       A.    Utilizing the RTI process.  I pull students

21   based on their deficiencies in mostly reading -- mostly

22   reading and writing.  Right now, I'm only working with K

23   through 3 because they have an excellent core program,

24   and the fourth and fifth graders don't need a lot of

25   tutors.

1   thinking, Yeah, but Sean's struggling with comprehension;

2   and actually it started with -- oh, Lynn Taylor was my

3   principal in there, too.  I totally forgot her.  I think

4   it started with her because she's, like, don't freak out,

5   because we had to have everybody in a specific group for

6   what they needed.  And she's, like, don't freak out, and

7   that's when they started universal access time, which is

8   Tiger Time.  At PV it was Galaxy Groups.  All schools

9   have a different name, and it's the same premise for

10  every school.

11       Q.    In your current position, as a tutor at

12  Paradise Valley Elementary, is that a full-time position?

13       A.    Yes, it is.

14       Q.    And is that a salaried position?

15       A.    Yes, it is.

16       Q.    What is your current salary?

17       A.    Right around 84,000, something like that.

18       Q.    Are there any opportunities for additional

19  compensation in your current position?

20       A.    Yes, I currently run an afterschool -- I call

21  it reading club for second grade.

22       Q.    Is that associated with Natrona County School

23  District Number One, or is that --

24       A.    It is associated with the school district.

25       Q.    What does that program consist of or what do

1    last name, but I am.  It will come to me in about two

2    minutes.

3        Q.    It's okay.  If you think about it, let me know.

4        A.    I will.

5        Q.    Okay.  I'm going to try to tie this timeline

6    together a little bit then.  Was your first year at

7    Cottonwood, would that have been the school year

8    2022-2023?

9        A.    I believe so, yes.

10       Q.    The school year prior, so 2021 to 2022, would

11   that have been your last year of teaching second grade at

12   Sagewood Elementary?

13       A.    Yes.

14       Q.    What was the reason that there was the change

15   in your position from a second grade teacher to a tutor?

16       A.    My ongoing problems with Anna Lavin and the

17   district.  I went and ended up talking to Mrs. Hensley,

18   who was very understanding and kind and asked me what I

19   would like to do, and I said, "I would like to be a

20   tutor.  I would like to be placed in a tutor position if

21   I could," and she placed me at Cottonwood.

22       Q.    Your last year at Sagewood Elementary, so

23   2021-2022, as a teacher, do you recall what your salary

24   was?

25       A.    I don't think we gained any.  Probably around

1    what I make now.  It was a lateral move.

2        Q.    And that was kind of what I was going to ask

3    you about is in what ways financially did you moving from

4    a teacher to a tutor change at all, if it did?

5        A.    It did not.

6        Q.    In any other ways, understanding it didn't

7    affect financially, but in any other ways, other than

8    what you already told me, can you explain any other

9    changes that you experienced other than moving schools

10    but going from a teacher to a tutor?

11        A.    Well, I was out from Anna's reign of terror,

12    number one, and being a tutor, in my opinion, is less

13    stressful.  Because you're working with small groups of

14    children, you don't have behavior issues that I

15    encountered in my last several years at Sagewood and just

16    having a supportive principal was a game changer.

17        Q.    And so I understand it correctly, the

18    decision -- and I'm going to ask you some questions more

19    about the reasoning for it, but the decision to move from

20    the second grade teacher to a tutor was a decision you

21    made yourself?  In other words, the school district

22    didn't make that decision for you?

23        A.    No.  Of course it was their decision.  They are

24    the ones that had the power to move me from second grade

25    to a tutor.  That doesn't happen unless there are

1   because of the amount of evidence that I kept.

2       Q.    The -- I think you called it a process, a long

3   process that you went through.  From your perspective,

4   when did this process begin?

5       A.    I believe it was 2019 when I went to the union

6   for help with a difficult coworker.  I had asked -- I had

7   talked to the coworker.  I had asked Anna to mediate or

8   have a reconciliation circle or something, and she did

9   nothing.  So I went to the union president for support

10  and assistance in resolving the difficulties.

11      Q.    Who was the coworker that you were having the

12  issue with?

13      A.    Stephanie Lovato.

14      Q.    And from your perspective, what was the issues

15  that you were having with Stephanie Lovato at that time?

16      A.    She spread malicious lies.  She was an

17  excessive gossip and ran and tattled to Anna, I would

18  probably say almost daily.  When I asked Anna -- when I

19  told Anna about going to the union president, she was

20  very taken aback.  Her eyes dilated, and she was, like,

21  how does this affect me.  And she said that she -- when I

22  asked her if Stephanie went to her often to complain

23  about me, she said she often vented to her.

24      Q.    Other than what you just testified to as far as

25  the spreading malicious lies of Ms. Lovato, were there

34

1   any other issues that you were having with her there at

2   that time that triggered you going to speak to the union

3   president?

4        A.    Issues with who?

5        Q.    Ms. Lovato.

6        A.    Basically tattling, venting, whatever you want.

7        Q.    What came of or what was the result of you

8   raising these issues with the union president?

9        A.    Right about that time, I got very, very ill,

10  and the focus switched to that.  Anna's treatment of me

11  (inaudible) --

12              COURT REPORTER:  I'm sorry, can you speak

13  up.

14       A.    Around that time, it was November of 2019, I

15  got very, very ill, and the focus then switched Anna's

16  treatment of me, after going to the union and getting

17  sick, flipped so the focus of the union changed to that.

18       Q.    (By Mr. Scoggin)  As I understood your

19  testimony earlier, you began -- or Anna Lavin began as

20  the principal where you were working in 2018; is that

21  correct?

22       A.    Yes, sir.

23       Q.    The first year that she was principal in 2018,

24  2019, did you have any issues?

25       A.    Not a one and I had a totally satisfactory

1    deteriorated with my health issues.

2         Q.    From your perspective, can you tell me in what

3    way did the working relationship with Ms. Lavin

4    deteriorate after October, November 2019?

5         A.    She was extremely cold, extremely critical,

6    very callous.  I was micromanaged, and her demeaner put

7    me into a constant state of terror.  I was terrorized by

8    her for the remainder of 2019, 2020, and then until I

9    left.

10        Q.    You say "a constant state of terror."  What do

11   you mean by that?  And I understand terror, but from your

12   perspective, what do you mean by that?

13        A.    She was hypercritical.  I was in a constant

14   state of fight or flight, and when I'm confronted with a

15   situation like that, I freeze.

16        Q.    Hypercritical of you in what way?

17        A.    Everything, my classroom, my teaching, my

18   standards.  My deficits were expounded upon weekly

19   because we met weekly, and it was half an hour of what I

20   was doing wrong.

21        Q.    You say you met weekly.  What kind of meetings

22   would you have on a weekly basis with Ms. Lavin as

23   principal?

24        A.    To go over my lesson plans and my teaching and

25   my room.

1    Echols, as she was the one receiving all the information

2    from the union.  She was often seen tearful, crying,

3    going into the counselor's office.  I think there was an

4    obvious breach of confidentiality, which I'm sure we'll

5    touch on later.

6        Q.    I want to go through the list and ask you about

7    each one of them.  So we got she was hypercritical during

8    the weekly meetings, the breach of confidentiality.  What

9    other issues did you have with Ms. Lavin?

10        A.    The coldness and unsupportive nature of our

11    meetings of she would sit down, glare at me, list all my

12    deficits.  It was a very unsupportive, uncaring

13    environment.  And then the breach of confidentiality, her

14    confidantes and friends, from the way they treated me,

15    they knew a lot more about the situation than they

16    possibly could have -- than they would have observed me.

17    The entire staff retaliated, which is all in what we gave

18    you in various ways; ending with the last day of school,

19    I was there.  Three of her friends danced around with

20    large cutouts of Anna's head to "Can't Touch This" at an

21    end of the year assembly when parents, students, staff,

22    everyone.  And the only reason I can think of that they

23    would do that was because Anna had told them the

24    resolution of what had transpired, and she was, like, in

25    the clear, as I couldn't touch her.

1    Q.    Yes, ma'am.

2    A.    By the time -- I was rudely ignored.  I would

3    talk and not be answered.  People would literally avert

4    their eyes when I said good morning and not respond.  By

5    the time I left, after 25 years at Sagewood, not one

6    person told me good-bye.  You know, that's how prevalent

7    it was in the staff.  They had all heard whatever Anna

8    had disseminated and believed it, and it was them against

9    me.

10    Q.    So what was it that Ms. Lavin told these other

11    members of the staff?

12    A.    I don't know.  I'm not privy to that, but it

13    was obviously negative.

14    Q.    How do you know it was negative if you weren't

15    privy to the conversation?

16    A.    By the demeanor and the effect it had on my

17    relationship with my coworkers.  Nobody would talk to me.

18    I opened the door for somebody, and they looked at me and

19    went through the other door.  It was daily, blatant

20    contempt.

21    Q.    Other than speculation on your part, how do you

22    know this treatment had anything to do with the OCR

23    investigation?

24    A.    Because that is when it started.  Before that,

25    I had a great relationship with the staff.  When my

1   difficulties with Anna began, I don't know that it was

2   specific to the OCR investigation.  It could have been

3   when Verba Echols received the letters from the union.

4   My union president of the state sent three letters and an

5   e-mail, I believe, asking Verba Echols, who was HR

6   associate superintendent or something like that, and Anna

7   to do something about the blatant retaliation.  It was

8   retaliation of me on behalf of the problems I was having

9   with Anna.

10      Q.      Were you personally present for any what you

11   claim breaches of confidentiality -- were you personally

12   present for what you claim were any breaches of

13   confidentiality on the part of Ms. Lavin?

14      A.      Whenever anything was happening, a letter was

15   sent, a report was filed, anything like that, I saw

16   Mrs. Lavin, I would say, at least four times go crying

17   into the office of the counselor, who is a district

18   employee, not a private counselor, and be locked in there

19   extended periods of time and come out crying.  She would

20   cry during staff meetings.  She would cry in the hall,

21   and I don't know what she told staff members because I'm

22   sure other staff members asked why she was so upset.

23      Q.      I'm going to ask the question again.  Can

24   you -- were you present and personally heard or

25   experienced Ms. Lavin breaching any confidentiality?

1    A.    No.

2    Q.    So it's fair to say that any of your claims for

3    breach of confidentiality are speculative on your part?

4    A.    Yes, but they're substantiated by the staff

5    treatment and her demeanor while talking to the counselor

6    or her actions while talking to the counselor.

7    Q.    And you don't know what was said between her

8    and the counselor, correct?

9    A.    No.  But it was -- it always coincided with

10   something coming down from the district.

11   Q.    That was a bad question, at least the way it

12   will look, I think, on the transcript.

13         I'll ask it this way:  Are you aware of

14   anything that was said between -- personally aware of

15   anything that was said between Ms. Lavin and the

16   counselor?

17   A.    No.

18   Q.    Other than what you said is the timing of these

19   things, do you have any other personal knowledge of any

20   breaches of confidentiality on the part of Ms. Lavin?

21   A.    No.

22   Q.    I note the next area that you stated was an

23   issue between you and Ms. Lavin.  I wrote down there was

24   a coldness.  She was unsupportive and uncaring.  I want

25   to ask you about that.

1          First off, when you mean [sic] coldness from

2     her, what do you mean by that?

3     A.    Just a frigid demeanor.  When we met, it was

4     one gotcha after another, spoken in a cold harsh voice.

5     Q.    Can you give me specific examples of what you

6     mean by "one gotcha after another"?

7     A.    I saw this, I saw this, I saw this.  Just

8     constant negative feedback.  Never any positives.  Never

9     a smile.  Never even a, you know, I noticed you did a

10    great job of handling blank today or things like that.

11    Q.    Can you tell me any other of the criticisms

12    that she provided to you that you disagreed with?

13    A.    Again, you have the file.  There's pages upon

14    pages of our meetings, and if you notice, when you look

15    at the documentation she provided about our meetings,

16    anything positive is written in a blue pen.  Everything

17    else is -- was a black and white copy, and I believe she

18    added those positives at a later date.

19    Q.    But what is the basis of your belief that the

20    positives were added at a later date?

21    A.    Because we did not discuss them, and there was

22    also an evaluation that I have a copy of something she

23    wrote in black pen when we met, the yellow part is still

24    yellow, what she wrote is black; and then the evaluation

25    she provided you, it was in blue.

1    Q.    What's the date of that evaluation?

2    A.    I don't recall.

3    Q.    You had mentioned, I think, earlier today about

4    the criticism she provided about the cabinets in your

5    classroom; is that correct?

6    A.    Yes.

7    Q.    What were you referring to there?

8    A.    That was how micromanaging she was, that she

9    went through my cupboards and could tell me what was

10   unorganized in each one, in my baskets, in my drawers, in

11   my desk thing.  She had gone through all that, without me

12   present, so she could berate me about it.

13   Q.    How do you know she went through these if you

14   weren't present?

15   A.    Because she told me what was in them and how it

16   should be -- or what was in them and how they should be

17   organized.

18   Q.    Did you agree with her that you had

19   organizational issues within the classroom?

20   A.    Yes.  But I don't think -- I don't see how a

21   closed cupboard or a private desk drawer is something

22   that she needed to be really concerned about.  I realize

23   it's all school property and they probably have the right

24   to go through it, but I found that particularly

25   intrusive.

1  fact that what she -- your perception of what she was

2  saying was different than how she was relaying it to you?

3         Let me ask it this way:  I hear you saying that

4  your perception of what Ms. Lavin was saying, as you just

5  testified to that example, was that it was cold.  That's

6  how you accepted it, fair?

7       A.    Yes.

8       Q.    That's what you testified to.  That's your

9  perception, correct?

10      A.    Uh-huh.

11      Q.    Is that yes, sorry?

12      A.    Oh, yes.

13      Q.    Doesn't mean -- that doesn't mean that she was

14 necessarily being cold, fair?

15      A.    Well, she was obviously angry.  When we met for

16 our weekly meetings, she was aggressive and angry.  She

17 always has kind of a flat affect.  I mean, she was never

18 a warm, cuddly person, which I respect.  It was always,

19 you know, flat demeanor, but this was more -- this was

20 definitely angry and aggressive.

21      Q.    Do you know if she treated anyone else

22 different in those meetings?

23      A.    I don't know who she had those meetings with so

24 I can't attest to that.

25      Q.    You testified a little while ago that another

1    teachers or staff members of the school that you

2    considered friends, and then your testimony is that they

3    changed over time which you believe was because of the

4    things that Ms. Lavin said?

5        A.    Yes.

6        Q.    You testified, I think it was on the last day

7    you were at the school, something about an incident and

8    "Can't Touch This."  Can you tell me, what happened on

9    that date?

10       A.    It was the end-of-the-year school assembly with

11   all students, all staff, parents.  I actually went to sit

12   by a parent who I was a friend, Amanda Henderson, and she

13   was very cold and kept turning away from me, which I

14   didn't understand.  But she was friends with Stephanie

15   Lovato and several other teachers so -- and I had had no

16   altercation with her, so it was obvious she had heard

17   what was going on, the school version versus the Sue

18   version, because like I said, we had always had a very

19   warm relationship.  And she literally turned away from me

20   while I was talking several times, which I didn't

21   understand.  I figured it out later.

22            And at the end, the -- Emily, Shawn, and Erin

23   came in with large cutouts of Anna's head, pictures on

24   sticks, and bobbed around the gym to "Can't Touch This"

25   by MC Hammer.  And they played the whole song and bopped

1  around, and it was apropos of nothing.  I mean, what else

2  happened that couldn't touch Anna that they were

3  celebrating?

4      Q.    Well, I guess I don't understand why you say it

5  was apropos.  What do you mean by that?

6      A.    That at that time, it looked like everything

7  had come to an end.  The OCR report was concluded.  The

8  biased internal lawyer report was concluded, the very --

9  concluded, the very biased report by Lori Karl, my

10  employer's counsel, which is a law firm to protect

11  employers, was done.  It looked like it was the end of

12  the road.  Fortunately, it was not.

13      Q.    Other than your speculating that's what this

14  was about, what other evidence do you have that this

15  event at the school assembly had anything to do with you?

16      A.    Because they mostly danced in the direction I

17  was in.

18      Q.    Where were you seated?

19      A.    Here's the gym.  I was here.

20      Q.    So, like, try to give an example, like,

21  bleachers --

22      A.    Yeah, there was chairs here.  All the kids are

23  here, chairs here, kids here, parents here on the side.

24  I was kind of here, and it was mostly in my area.

25      Q.    Were there other teachers in your area?

1    Q.    (By Mr. Scoggin)  I just want to make sure I

2    have it all, Ms. Christensen, if you could list what

3    disabilities you have.

4    A.    I have chronic sinusitis resulting in surgery.

5    I don't know that that's one.

6          Relapsing polychondritis, do you need an

7    explanation of it?

8    Q.    Why don't we list them, and then I'll have you

9    give an explanation from your perspective.  Thanks.

10    A.    Long-term COVID, anxiety, neuromuscular

11    orthopedic diagnosis.  I have a permanent disabled

12    parking placard because of it, because of my

13    bone/joint/balance issues.  The TRA malformation, long

14    COVID, the degenerative joint disease.  Other diagnoses I

15    have are documented heavily in my file.  These are the

16    major categories.

17    Q.    Any other disabilities that you can think of

18    right now?

19    A.    No.

20    Q.    I want to ask you --

21    A.    Sorry, chronic pain.

22    Q.    Any others you can think of right now, ma'am?

23    A.    Not right now.

24    Q.    The -- I want to ask you a little bit about

25    each one of those.  As far as the chronic sinusitis,

1    other than the request for the air purifier we've already

2    discussed and testified to, did you request any other

3    accommodations for that from the school district?

4        A.    I did.

5        Q.    What other accommodations did you request?

6        A.    In fall of 2020, I asked my otolaryngologist --

7    asked if I could wear a face shield instead of a mask

8    because I had had sinus surgery, and the mask hurt where

9    they rebuilt my nose, where the cartilage deteriorated

10   from my autoimmune disorder.

11       Q.    And did you -- were you able to wear that face

12   shield?

13       A.    Uh-huh, yes.

14       Q.    What period of time did you wear the face

15   shield?

16       A.    I think a month or so, just while it heals up.

17       Q.    Any other accommodations that you requested in

18   regards to the sinusitis?

19       A.    The air purifier down the road.

20       Q.    Anything else that you can think of as far as

21   accommodations?

22       A.    No.

23       Q.    The second one is -- and I did not get it

24   all -- relapsing, what was it?  I'm sorry.

25       A.    Polychondritis.  Never heard of it.  Never met

1    one of the other 5,000 people in the world with it.

2        Q.    The relapsing polychondritis, what is your

3    understanding of that?

4        A.    Rare chronic autoimmune disease characterized

5    by recurrent inflammation of cartilage throughout the

6    body, and the symptoms are pain, swelling, redness in

7    ears, nose, joints, eyes, and trachea, saddle nose

8    deformity, which is what happened to me, my nose

9    collapsed, hearing loss.  I have hearing aids.

10   Hoarseness, I have hoarseness, difficulty breathing,

11   fatigue, which I never had.  Long-term COVID.

12       Q.    With the relapsing polychondritis, what

13   accommodations have you requested for that, ma'am?

14       A.    I requested that the elevator always be in use

15   at Cottonwood.  I requested preferential parking.

16   Cottonwood had a teacher parking lot and a closer parking

17   lot, and that's why I went to my doctor and got the

18   permanent placard for the disability parking so it

19   wouldn't be an issue anymore.  And I only used it on

20   really snowy days.  I'm usually -- right now it's under

21   control for the most part.  Those dis -- those

22   accommodations were denied by Mr. Silva without even

23   having a meeting.  He just flat out said that I had

24   also -- we had also requested that I stay in the same

25   school in the same position to reduce stress because

1    stress greatly impacts autoimmune.  I did not need an air

2    purifier at that school, so I did not request that.

3        Q.    So just so I understand your -- that last part

4    of your answer, is it your testimony that you were denied

5    the request for the elevator?

6        A.    I was denied by Mr. Silva to even have a

7    meeting.  Kelly Paddock later reached out to me.

8        Q.    And that's not what I'm asking.  I'm asking, as

9    far as you said you had asked for the accommodation of

10   the elevator in use -- being in use, was that -- did you

11   ever have an issue with the elevator not being in use?

12       A.    Yes.  There was children [sic] with a behavior

13   disorder, and one of her tricks was to get in the

14   elevator and ride up and down, so they would turn it off.

15   And then I would have to walk the stairs, and I have a --

16   one replaced knee, another knee that they're ready to

17   replace, and stairs are very hard on knees.  So it was

18   definitely a challenge as my office was upstairs, and my

19   classrooms were downstairs.  So it was multiple treks up

20   and down the stairs every day.  So I wanted either the

21   child's behavior to be contained to where she wasn't

22   riding the elevators causing it to be turned off.  Like,

23   it was turned off, I think, for two days at one point,

24   and I didn't know if I could get a key for it so I could

25   still use it.  I just wanted it to be accessible to me at

86

1     all times.

2          Q.    Did you request a key for it?

3          A.    I requested for it to be accessible at all

4     times.

5          Q.    Did you request a key to be able to use it?

6          A.    I don't recall.  I assumed that was encompassed

7     in accessible.  What I really wanted was it to just work

8     all the time.

9          Q.    You mentioned the second accommodation

10    requested was the preferential parking?

11         A.    Uh-huh.

12         Q.    What -- are you able to tell me, were you able

13    to park in the preferential parking area?

14         A.    Most days.  Some days it was full.

15         Q.    As far as the long-term COVID, what

16    accommodations did you request for that other than what

17    you already told me for the other conditions?

18         A.    For the COVID, I requested the FMLA at one

19    time.

20         Q.    And that was granted, correct?

21         A.    Oh, yes.

22         Q.    Any other accommodations in regards to the

23    long-term COVID?

24         A.    No.  I should have, but in 2019 when I had it,

25    when it started, COVID was not a thing.  They had no idea

1    what was wrong with me.  They -- I kept hearing it was

2    anxiety.  It's anxiety.  So I internalized, thought it

3    was all my fault, didn't -- I did not ask for any

4    accommodations for COVID.

5        Q.    As far as then the anxiety, what accommodations

6    have you requested from the school district in regards to

7    the anxiety?

8        A.    To stay at the same school I was at and not

9    switch schools.

10       Q.    Just so I understand, because there's been a

11   couple schools, what are you referencing in that answer,

12   ma'am?

13       A.    I requested to remain a tutor at Cottonwood for

14   the '24-'25 years.

15       Q.    You were denied that?

16       A.    Obviously.  I'm at Paradise Valley this year.

17       Q.    Any other accommodations you requested in

18   regards to the anxiety?

19       A.    No.

20       Q.    The neuromuscular orthopedic diagnosis, what

21   accommodations have you requested?

22       A.    The close parking and the elevator access.

23       Q.    As far as the degenerative joint disease and

24   chronic pain, any other accommodations you requested from

25   the school district other than what you already told me

1    as far as the elevator and the preferential parking?

2        A.    No.

3        Q.    Any other -- and I'm not referencing just one

4    specific disability, but any other accommodations that

5    you've requested from the school district that you've

6    been denied?

7        A.    Not that I recall.

8        Q.    I'm really probably pretty close to being done,

9    but I want to take ten minutes to look back at my notes.

10   Let's take a break for about ten minutes and come back.

11   I'll probably be finished or pretty close to finished.

12                      (Deposition proceedings recessed from

13                       12:35 p.m. to 12:55 p.m.)

14       Q.    (By Mr. Scoggin)  Not too much.  Just a few

15   more questions.

16            Ms. Christensen, you had testified earlier this

17   morning about some forms that you said Ms. Lavin had

18   added the positive -- some positive comments to after the

19   fact.  Do you recall that testimony?

20       A.    Yes.

21       Q.    What kind of forms were those that you're

22   referring to?

23       A.    She would do, like, a running commentary when

24   she came to observe a room, and there were many in the

25   file you sent me, more than I received when I asked for

1                      DEPONENT'S CERTIFICATE

2

3              I, SUSAN CHRISTENSEN, do hereby certify

4    that I have read the foregoing transcript of my testimony

5    consisting of 91 pages, taken on March 11, 2025, and that

6    the same is a full, true and correct record of my

7    deposition.

8

9              _____
10                     SUSAN CHRISTENSEN

11

12        ( ) No changes          ( ) Changes attached

13

14

15        Subscribed and sworn to before me this _____

16    day of _____, 202__.

17

18

19              _____
20                     Notary Public

21

22    My commission expires:    _____

23

24

25

1               C E R T I F I C A T E

2

3

4          I, ALEXIS TAYLOR, Registered Professional

5   Reporter and a Notary Public of the State of Wyoming, do

6   hereby certify that the aforementioned deponent was by me

7   first duly sworn to testify to the truth, the whole

8   truth, and nothing but the truth;

9          That the foregoing transcript is a true record

10  of the testimony given by the said deponent, together

11  with all other proceedings herein contained.

12          IN WITNESS WHEREOF, I have hereunto set my

13  hand and affixed my Notarial Seal this _____ day of

14  _____, 202__.

15

16

17

18

19                    _____
                                ALEXIS TAYLOR

20

21

22

23  My commission expires March 11, 2028.

24

25